**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IRAQ TELECOM LIMITED,

                *Plaintiff*,

      *-v-*

SIRWAN SABER MUSTAFA, KOREK
TELECOM COMPANY LLC, and KOREK
INTERNATIONAL (MANAGEMENT)
LIMITED,

            *Defendants,*

      *and*

IBL BANK S.A.L.,

           *Garnishee*.

Case No. <u>1:25-mc-00077-DEH</u>

<u>ORAL ARGUMENT REQUESTED</u>

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF IRAQ TELECOM'S**
**<u>MOTION FOR A TURNOVER ORDER AGAINST IBL BANK S.A.L</u>**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................2

    I.      Iraq Telecom's $810-Million Dollar Investment In Korek ...................................3

    II.     The IBL Loan Scheme ........................................................................................4

    III.    The LAMC Award .............................................................................................6

    IV.   The ICC Arbitration Award And Subsequent Judgment Confirming It ................9

    V.     IBL's Custody And Possession Of Judgment Debtors' Money Or Property ........11

LEGAL STANDARD ..............................................................................................................14

ARGUMENT.........................................................................................................................15

I.      THIS COURT SHOULD ORDER IBL TO TURN OVER JUDGMENT
       DEBTORS' COLLATERAL AND INTANGIBLE PROPERTY RIGHTS
       UNDER CPLR 5225(B). ...................................................................................16

    A.     This Court Has Personal Jurisdiction Over IBL. ................................................16

        1.     New York's Long-Arm Statute Provides For Personal Jurisdiction
              Over IBL. .............................................................................................17

        2.     Exercising Personal Jurisdiction Over IBL Is Consistent With Due
              Process. ...............................................................................................19

    B.     All Requirements For Turnover Under CPLR 5225(b) Are Satisfied. .................20

    C.     This Court Can Order Turnover Of Overseas Property Because It Has
        Personal Jurisdiction Over IBL. ......................................................................21

II.     IN THE ALTERNATIVE, THIS COURT SHOULD ENTER A MONEY
       JUDGMENT AGAINST IBL BANK. ..........................................................................22

CONCLUSION......................................................................................................................24

CERTIFICATION OF COMPLIANCE.......................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al Rushaid v. Pictet & Cie*,
68 N.E.3d 1 (N.Y. 2016) ...............................................................................................17

*All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999) ...........................................................................................23

*AT&T Mobility Holdings B.V. v. Grupo Salinas Telecom, S.A. de C.V.*,
234 N.Y.S.3d 101 (N.Y. App. Div. 1st Dep't 2025)......................................................21

*Attestor Master Value Fund LP v. Argentina*,
113 F.4th 220 (2d Cir. 2024) .................................................................................. 14, 15

*Bangladesh Bank v. Rizal Com. Banking Corp.*,
208 N.Y.S.3d 2 (N.Y. App. Div. 1st Dep't 2024)..........................................................18

*Bass v. Bass*,
528 N.Y.S.2d 558 (N.Y. App. Div. 1st Dep't 1988)......................................................23

*Beauvais v. Allegiance Sec., Inc.*,
942 F.2d 838 (2d Cir. 1991) .........................................................................................20

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
714 F. Supp. 3d 416 (S.D.N.Y. 2024) ..........................................................................20

*Clearstream Banking, S.A. v. Peterson*,
145 S. Ct. 2819 (2025) ..................................................................................................15

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
423 F. Supp. 3d 45 (S.D.N.Y. 2019)..............................................................................20

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
879 F.3d 462 (2d Cir. 2018) ................................................................................... 14, 15

*Daou v. BLC Bank, S.A.L.*,
42 F.4th 120 (2d Cir. 2022) ..........................................................................................17

*Edwardo v. Roman Cath. Bishop of Providence*,
66 F.4th 69 (2d Cir. 2023) ............................................................................................16

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ......................................................................................................19

*Glob. Tech., Inc. v. Royal Bank of Canada*,
2012 WL 89823 (N.Y. Cnty. Sup. Ct. 2012) ........................................................22

*Gryphon Domestic VI, LLC v. APP International Finance Co.*,
836 N.Y.S.2d 4 (N.Y. App. Div. 1st Dep't 2007)................................................21

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ..................................................................................15

*Hotel 71 Mezz Lender LLC v. Falor*,
926 N.E.2d 1202 (N.Y. 2010)..............................................................................23

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
43 F.4th 263 (2d Cir. 2022) .............................................................................9, 12

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
597 F. Supp. 3d 657 (S.D.N.Y. 2022) ..............................................................9, 19

*Iraq Telecom Ltd. v. IBL Bank S.A.L.*,
2022 WL 827094 (S.D.N.Y. Mar. 16, 2022) .........................................................9

*Iraq Telecom Ltd. v. Mustafa*,
2024 WL 3927219 (E.D. Pa. Aug. 23, 2024) .......................................................11

*John Wiley & Sons, Inc. v. Kirtsaeng*,
2009 WL 3003242 (S.D.N.Y. Sept. 15, 2009)......................................................22

*JPMorgan Chase Bank, N.A. v. Motorola, Inc.*,
846 N.Y.S.2d 171 (N.Y. App. Div. 1st Dep't 2007)............................................23

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negara*,
313 F.3d 70 (2d Cir. 2002) ..................................................................................21

*Koehler v. Bank of Bermuda Ltd.*,
911 N.E.2d 825 (N.Y. 2009).................................................................... 15, 21, 22

*LaBarbera v. Audax Const. Corp.*,
971 F. Supp. 2d 273 (E.D.N.Y. 2013)........................................................... 14, 23

*Lelchook v. Societe Generale de Banque au Liban S.A.L.*,
147 F.4th 226 (2d Cir. 2025) ...............................................................................19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ..................................................................................17

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ................................................................................19

*Motorola Credit Corp. v. Standard Chartered Bank*,
771 F.3d 160 (2d Cir. 2014) .............................................................................22

*Motorola Credit Corp. v. Standard Chartered Bank*,
21 N.E.3d 223 (N.Y. 2014)...............................................................................13

*Next Invs., LLC v. Bank of China*,
12 F.4th 119 (2d Cir. 2021) ..............................................................................22

*Pala Assets Holdings, Ltd. v. Rolta, LLC*,
167 N.Y.S.3d 788 (N.Y. App. Div. 1st Dep't 2022)..........................................21

*Peterson v. Bank Markazi*,
121 F.4th 983 (2d Cir. 2024) ............................................... 15, 16, 17, 18, 19, 22

*Reich v. Casabella Landscaping, Inc.*,
2024 WL 4950033 (S.D.N.Y. Dec. 3, 2024) ......................................................20

*Republic of Argentina v. Attestor Master Value Fund LP*,
145 S. Ct. 1141 (2025) .....................................................................................15

*Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*,
740 F.3d 108 (2d Cir. 2014) .............................................................................14

### Statutory Authorities

28 U.S.C. § 1782........................................................................................... 6, 11

N.Y. Civil Practice Law Sections
    CPLR Article 52........................................................................................22
    CPLR 302 ................................................................................................15
    CPLR 302(a)(1)........................................................................ 16, 17, 18, 19
    CPLR 302(a)(2)........................................................................ 16, 17, 18, 19
    CPLR 5201 ..............................................................................................23
    CPLR 5222(d) ..........................................................................................13
    CPLR 5222 ..............................................................................................12
    CPLR 5224 ..............................................................................................12
    CPLR 5225 ............................................................................................2, 14
    CPLR 5225(b).................................................. 1, 2, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23
    CPLR 5227 .........................................................................1, 2, 14, 15, 22, 23

### Rules and Regulations

Federal Rule of Civil Procedure 69.......................................................1, 2, 12, 13, 14

**Additional Authorities**

David D. Siegel, *Practice Commentaries* § 510 (6th ed. Dec. 2024 update)...............................23

David D. Siegel, *Practice Commentaries* § C5201:5 (McKinney 1997).....................................23

*IBL Bank Annual Reports: 2011 to present*,
    https://tinyurl.com/2yyp8wwx ......................................................................................8, 12

*IBL Bank Annual Report 2018*,
    https://tinyurl.com/yzx24dh4 .............................................................................................12

*IBL Bank 2023 Audit Report*,
    https://tinyurl.com/y2zac932 ...............................................................................................8

Richard C. Reilly, McKinney's Practice Commentaries,
    C5227:3, *Proceedings under CPLR 5225(b) and 5227 Distinguished* (2015).......................14

U.S. Commercial Serv., Dep't of Commerce, *Lebanon Country Commercial
    Guide 2021* (2021),
    https://tinyurl.com/33wbnned .............................................................................................12

U.S. Dep't of Treasury, *Treasury Targets Two Politically Connected Brothers in
    Lebanon for Profiting from Public Corruption*, Apr. 4, 2023,
    https://tinyurl.com/3rv3sfhm .................................................................................................4

Plaintiff Iraq Telecom Limited ("**Iraq Telecom**"), acting for itself and on behalf of International Holdings Limited ("**IHL**," collectively, the "**Judgment Creditors**"), respectfully submits this Memorandum of Law in support of its Motion for a Turnover Order (the "**Motion**") pursuant to Federal Rule of Civil Procedure 69 and Sections 5225(b) and 5227 of the N.Y. Civil Practice Law and Rules ("**CPLR**"). Specifically, the Judgment Creditors seek an order compelling IBL Bank S.A.L. ("**IBL**" or "**Garnishee**") to turn over certain funds and intangible property rights that are, or that were at all times material to this motion, in its possession and in which Defendants/Judgment Debtors Sirwan Saber Mustafa ("**Mr. Barzani**"), Korek Telecom Company LLC ("**Korek**"), and Korek International (Management) Limited ("**CS Ltd.**," and collectively, "**Judgment Debtors**") have an interest.

## PRELIMINARY STATEMENT

This Motion seeks turnover from IBL of money and intangible property rights that belong to Judgment Debtors in order to satisfy the underlying $1.8-billion money judgment in this case (the "**Judgment**"). The Judgment confirms an arbitration award (the "**ICC Award**") which found the Judgment Debtors to have engaged in an unlawful means conspiracy to corruptly procure regulatory action from Iraqi State officials for the purpose of damaging Iraq Telecom and ultimately eviscerating Iraq Telecom's investment of more than $800 million in Korek for their own benefit. As found in the ICC Award and a prior arbitration award issued directly against IBL (the "**LAMC Award**"), IBL conspired with the Judgment Debtors to launder money through New York–based correspondent accounts to effectuate the fraud. As a result of that scheme, IBL has in its custody at least $155 million to the credit of Lebanese accounts that belong to Mr. Barzani (the "**Barzani Collateral**").

The Court should order turnover of the Barzani Collateral, any and all intangible rights to that collateral, and all other assets of the Judgment Debtors in IBL's custody pursuant to Federal

Rule of Civil Procedure 69 and CPLR 5225(b).  Turnover is proper whenever (1) the garnishee is "in possession or custody of money or other personal property," (2) "the judgment debtor[s] ha[ve] an interest" in that money or property, and (3) "the judgment debtor[s] [are] entitled to the possession of such property or [] the judgment creditor's rights to the property are superior to those of [IBL]."  CPLR 5225(b).  All three requirements are satisfied.  Correspondent banking data indisputably demonstrates IBL's possession of Judgment Debtors' property, while also revealing Judgment Debtors' rights to that property and IBL's participation in the scheme to defraud Plaintiff and enrich itself.  These facts warrant turnover of the Barzani Collateral, any and all intangible rights to that collateral, and all other assets of the Judgment Debtors in IBL's custody pursuant to CPLR 5225.

In the alternative, Iraq Telecom respectfully requests that this Court enter judgment against IBL equal to the debt it owes to the Judgment Creditors pursuant to CPLR 5227.  The legal analysis for CPLR 5227 is identical to that for CPLR 5225(b), except that it allows for entry of judgment against the garnishee directly.  As a result, a judgment against IBL equal to the sums within those accounts is proper for the same reasons that turnover is proper.

## BACKGROUND

This action arises out of Judgment Creditors' efforts to recover their investment of hundreds of millions of dollars in Korek, an Iraqi enterprise, after it was stolen from them through a set of elaborate fraud and bribery schemes committed by the Judgment Debtors and IBL.  *See generally* Decl. of Kristin N. Tahler ISO Mot. ("**Tahler Decl.**"), Ex. 1, ICC Award § D (Background), § K ¶¶ 34-79 (tribunal's analysis of the IBL Loan fraud); Tahler Decl., Ex. 2, LAMC Award ¶¶ 844-973 (same).

2

## I.    Iraq Telecom's $810-Million Dollar Investment In Korek

Korek started operations in 2000 as a regional mobile telephone licensee in Kurdistan.  ICC Award § D ¶ 1.  The original shareholders of Korek were three high net-worth Iraqi individuals, including Mr. Barzani—a member of the Barzani family that has long dominated the governance of Kurdistan, and continues to do so.  *Id.*

In August 2007, Korek was awarded a nationwide mobile telephone license by the Iraqi Communications and Media Commission (the "**CMC**"), the government agency responsible for mobile telephone licensing.  *Id.*  The license required Korek to pay $1.25 billion in a series of installments.  *Id.* ¶ 2.  Korek was unable to pay the second installment of $250 million on its own and sought outside financing from Agility Public Warehousing Company KSCP ("**Agility**") through its subsidiary Alcazar Capital Partners ("**Alcazar**").  *Id.* ¶ 3.  Alcazar invested $250 million in Korek through a convertible senior loan note guaranteed by the Kurdistan Regional Government of Iraq.  *Id.*

In 2010, Korek required additional financing and technical expertise to expand its network beyond Kurdistan.  *Id.* ¶ 4.  In 2011, Agility partnered with French telecommunications company Orange S.A. ("**Orange**") and formed Iraq Telecom.  *Id.* ¶¶ 4-5.  Iraq Telecom invested more than $810 million in Korek and took a 44% indirect stake in the company (the "**2011 Investment**").  *Id.* ¶¶ 5-6.  The 2011 Investment, which was approved by the CMC, was structured such that joint-venture vehicle IHL acquired Korek; Iraq Telecom acquired 44% of IHL; and Korek's original Iraqi shareholders, including Mr. Barzani, held a 56% interest in IHL through their investment vehicle, CS Ltd.  *Id.* ¶¶ 4-6.

The 2011 Investment was effectuated through several agreements—including a Shareholders' Agreement (the "**SHA**") dated March 10, 2011 among Iraq Telecom, IHL, Korek, Mr. Barzani, and CS Ltd, and an Amended and Restated Subscription Agreement (the

3

"**Subscription Agreement**") dated July 27, 2011. *Id.* ¶ 6; *see* Tahler Decl., Ex. 3 (SHA); *see* Tahler Decl., Ex. 4 (Subscription Agreement). Under the SHA, Iraq Telecom extended a $285-million loan to IHL (the "**Iraq Telecom Shareholder Loan**"). ICC Award § D ¶ 6. IHL then agreed to provide a $285-million loan to Korek, and Korek guaranteed IHL's obligations to Iraq Telecom under the Iraq Telecom Shareholder Loan. *Id.*

## II.    The IBL Loan Scheme

Less than a year after the 2011 Investment was finalized, Korek required additional funds of around $150 million to make payments to the Iraqi government by November 2011. *Id.* § K ¶ 2. That amount comprised at least $110 million towards another instalment of Korek's CMC license fees, and $30 million in late-payment interest. *Id.* § D ¶ 10, § K ¶ 2. Mr. Barzani and his associate, Lebanese businessman Raymond Rahmeh ("**Mr. Rahmeh**")—whom the U.S. government sanctioned for corruption just two years ago[1]—arranged for Korek to obtain a purportedly unsecured loan of $150 million from IBL, a Lebanese bank, at an interest rate of 13.25% (rising to 15.25% upon default) with the subordination of the $285-million Iraq Telecom Shareholder Loan to the IBL Loan (the "**IBL Loan**"). *Id.* § D ¶¶ 11-13; *see* Tahler Decl., Ex. 5. These terms were presented as non-negotiable and necessary because the IBL Loan was unsecured. ICC Award § D ¶¶ 12-13.

Based on this representation, Iraq Telecom entered into a subordination agreement in December 2011 with IBL, Korek, and IHL (the "**Subordination Agreement**"). *See* Tahler Decl., Ex. 6. Under the Subordination Agreement, the IBL Loan would take precedence over the Shareholder Loan if Korek defaulted. *Id.* at 3. On December 21, 2011, the IBL Loan agreement

---

[1]   U.S. Dep't of Treasury, *Treasury Targets Two Politically Connected Brothers in Lebanon for Profiting from Public Corruption*, Apr. 4, 2023, https://tinyurl.com/3rv3sfhm (last visited October 20, 2025).

was concluded between Korek as borrower, Mr. Barzani as Guarantor, and IBL as Lender. *See* IBL Loan at 1, 13.

Later investigation revealed that the IBL Loan and Subordination Agreement were part of an elaborate fraud against Iraq Telecom by IBL, Mr. Barzani, and others. *See* ICC Award § K ¶¶ 49-65. Contrary to IBL, and Messrs. Barzani and Rahmeh's representations, the IBL Loan *was in fact fully secured* with a $155-million cash collateral provided by Mr. Barzani (the Barzani Collateral) that Mr. Barzani and IBL routed through one of IBL's correspondent New York bank accounts and deposited with IBL on December 20, 2011—the day before the IBL Loan agreement was concluded. *Id.* § K ¶¶ 50-54; Tahler Decl., Ex. 7 (Dec. 20, 2011 SWIFT record of Barzani Collateral transfer to Mr. Barzani's IBL account). Iraq Telecom was thus fraudulently induced both to approve the IBL Loan and to enter into the Subordination Agreement. ICC Award § K ¶¶ 50-54. IBL, whose loan was fully secured by the Barzani Collateral and bore no risk on the IBL Loan, secretly kicked back to Mr. Barzani approximately 96% of Korek's interest payments, totaling over $19 million per year. *Id.* § D ¶ 19, § K ¶¶ 57-58. Based on disclosures in IBL's annual reports, these illicit interest payments to Mr. Barzani have exceeded $200 million. LAMC Award ¶ 430; *see infra* III.

Korek failed to pay the IBL Loan when it became due in 2015. ICC Award § D ¶ 16; *see* LAMC Award ¶¶ 914-15. IBL declared Korek in default. But rather than seize the Barzani Collateral (which would have covered the amount due), IBL invoked the Subordination Agreement and demanded that Korek and IHL cease payments on the Iraq Telecom Shareholder Loan and make interest payments solely on the IBL Loan. LAMC Award ¶ 916; ICC Award § D ¶¶ 16-17. Korek and IHL did so. ICC Award § D ¶ 14*; see Iraq Telecom Ltd v. IBL Bank S.A.L.*, No. 1:21-cv-10940, Dkt. No. 122, at 4 (Apr. 8, 2022). Thus, while Korek has paid IBL hundreds of millions

5

of dollars in interest (approximately 96% of which it illicitly funneled to Mr. Barzani), the Iraq Telecom Shareholder Loan remains unpaid. ICC Award § D ¶¶ 16-17.

In August 2017, IBL demanded that Korek provide "additional collateral," which tipped off Iraq Telecom that the IBL Loan might in fact be collateralized—contrary to IBL's and the Judgment Debtors' representations. ICC Award § D ¶¶ 17-18. Iraq Telecom wrote to IBL on four separate occasions to inquire what it meant by "additional collateral." LAMC Award ¶¶ 920-24. IBL ignored those requests and, along with Mr. Barzani, denied that the IBL Loan was collateralized. ICC Award § D ¶ 18.

Through a discovery proceeding commenced in this Court under 28 U.S.C. § 1782 ("**Section 1782**"), Iraq Telecom discovered that Mr. Barzani and IBL had secretly collateralized the IBL Loan with the Barzani Collateral. *See In re Ex Parte App. of Iraq Telecom*, No. 1:18-mc-00458 (S.D.N.Y. 2018). Wire transfer records obtained as part of that proceeding proved that on December 20, 2011, the day before Korek entered into the IBL Loan, Mr. Barzani transferred the $155-million Barzani Collateral from his account at HSBC in Dubai to his account at IBL in Beirut, Lebanon. Ex. 7 (Barzani Collateral SWIFT transfer record). A record of Mr. Barzani's transfer demonstrates that IBL routed and received the Barzani Collateral via a New York correspondent banking account at The Bank of New York Mellon. *Id.*

### III.   The LAMC Award

In June 2018, Iraq Telecom initiated the LAMC Arbitration, Case No. 175/2018, against IBL, Korek, and IHL, alleging that Mr. Barzani and IBL fraudulently induced Iraq Telecom to enter into the Subordination Agreement. IBL, Korek, and IHL appeared and participated in the arbitration. IBL admitted in the LAMC Arbitration that the IBL Loan was collateralized, and had been all along. LAMC Award ¶¶ 490-91, 510.

6

The LAMC tribunal rendered the 245-page LAMC Award on September 21, 2021, concluding that "there were deliberate and intentional acts from [Korek and IBL] which induced [Iraq Telecom] to enter into the Subordination Agreement, [Korek and IBL's] silence clearly amounting to an act of concealment." LAMC Award ¶ 966. The tribunal found that IBL, Mr. Barzani, and Korek (1) "knowingly refrained from indicating to [Iraq Telecom] that the cash collateral was part of [the] requirements" to agree to the loan; (2) failed in their "duty to disclose," in "violation of the requirements of good faith and honesty in banking transactions, in particular in transactions amongst shareholders and partners"; and (3) "actively participated in the commission of *dol*," i.e., fraud under Lebanese law. *Id.* ¶¶ 949, 953-54, 967. It also found that the IBL Loan was a "carefully orchestrated" plan designed to benefit Mr. Barzani, and to "conceal the fact that Mr. [Barzani] was in reality providing a shareholder loan" and "prioritise Mr. [Barzani]'s creditor-rights over [those of Iraq Telecom], notwithstanding Mr. [Barzani] agreeing to the contrary in the [Shareholders' Agreement]." *Id.* ¶ 953. The existence of the scheme "cannot be disputed," the tribunal explained, as "more than 96% of the total interest expense paid by [Korek] to [IBL] was paid to Mr. [Barzani]." *Id.* Indeed, IBL had specifically "denied the existence of the cash collateral … and fraudulently concealed its existence" from Iraq Telecom, as evident from "the detailed terms of the IBL Loan Agreement which fail to mention the cash collateral." *Id.* ¶ 969. Because IBL and the other respondents in the LAMC Arbitration "committed [fraud]," the LAMC tribunal ruled that "the Subordination Agreement is null and void." *Id.* ¶ 970.

The tribunal also confirmed the existence of the fraudulent kickback scheme in which IBL secretly funneled approximately 96% of the interest that Korek paid it to Mr. Barzani, while keeping the remainder as commission. *Id.* ¶ 953. IBL's annual reports from 2012 onwards

7

describe these kickback payments as an interest expense on Mr. Barzani's collateral. *See* ICC Award § K ¶¶ 57-58 (analyzing IBL's reports from 2012 to 2016 and "agree[ing] ... that 'expense' represents sums paid back to Mr. [Barzani]"). This pattern continued through at least 2023. IBL's 2023 report notes a sum of 2,325 billion Lebanese Pounds (approximately 155-million USD[2]) deposited by a non-resident customer as cash collateral to cover an outstanding loan, and a corresponding sum of 256.2 billion Lebanese Pounds (approximately 17-million USD) as IBL's "related" interest expense.[3] Based on the disclosures in IBL's reports from 2012 to 2023,[4] these kickback payments to Mr. Barzani over at least 12 years have exceeded $200 million.

The tribunal did not, however, render a decision on damages, as Iraq Telecom had reserved its right to seek damages in subsequent arbitration proceedings if IBL were found liable. *See* LAMC Award ¶ 805.

Iraq Telecom then petitioned this Court for three forms of relief: recognition and confirmation of the LAMC Award under the New York Convention, a declaratory judgment adopting the Award's fraud findings, and attachment of IBL's New York correspondent banking accounts to aid ongoing Lebanese arbitration proceedings. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 1:21-cv-10940, Dkt. No. 21 (S.D.N.Y. Jan. 28, 2022). On April 8, 2022, this Court granted Iraq Telecom's petition to confirm the LAMC Award,[5] after initially confirming

---

[2]   The USD amount of the annual interest payment was calculated by dividing the LBP amount stated in IBL's annual report by the USD-LBP exchange rate set by the Lebanese central bank, Banque du Liban, at the close of the year.

[3]   *IBL Bank 2023 Audit Report*, at 65, https://tinyurl.com/y2zac932 (last visited October 20, 2025).

[4]   *See IBL Bank Annual Reports: 2011 to present*, https://tinyurl.com/muwvtpth (last visited October 20, 2025).

[5]   IBL has sought to annul the LAMC Award through Lebanese court proceedings. Although an intermediate appellate court granted the annulment, Lebanon's highest court—the Court of Cassation—has stayed that decision pending its own review.

attachment of $3 million in IBL's New York accounts. *See Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 597 F. Supp. 3d 657, 669 (S.D.N.Y. 2022); *see also Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 2022 WL 827094, at *19 (S.D.N.Y. Mar. 16, 2022) (confirming attachment of $3 million in IBL's New York Accounts), *aff'd in part, vacated in part, remanded*, 43 F.4th 263 (2d Cir. 2022). After Iraq Telecom's appeal to the Second Circuit, which resulted in a partial remand, and subsequent briefing, this Court increased the attachment amount to $17.36 million. *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, No. 1:21-cv-10940, Dkt. No. 186 (S.D.N.Y. Jan. 9, 2023). The $17.36 million in attached funds are held across IBL's correspondent banking accounts with Citibank, JPMorgan Chase, and The Bank of New York Mellon. *See id.*

## IV.    The ICC Arbitration Award And Subsequent Judgment Confirming It

Meanwhile, in July 2014, the CMC issued an order (the "**CMC Order**") which directed Korek to: (i) "reinstate the status as it was on" March 13, 2011 (that is, prior to Agility's acquisition of an indirect equity stake in Korek); (ii) "take the procedures to revoke and terminate any contracts assigning shares in [Korek's] capital that were concluded after" March 13, 2011, (iii) "prove this revocation in the legal entries with the companies registrar," and (iv) "provide [the CMC] with a new statement proving [the] return of shares to their [original] owners"—failing which the CMC would take all necessary procedures "to compel [Korek] to obey and execute" the content of the CMC Order. *See* ICC Award § D ¶ 30. The CMC Order commanded Korek to complete all of these actions within 15 days of the letter. *Id.* ¶ 30. Korek's further appeals of the CMC Order were unsuccessful. *Id.* ¶¶ 31, 43. Iraq Telecom was not allowed to join these appeals, and its communications with the CMC were rebuffed by that body—which instead communicated to Korek that it had no contractual link with, or obligation to, Iraq Telecom. *Id.* ¶¶ 42-43.

Upon the conclusion of these unsuccessful appeals, the Kurdistan Companies Registry then purported to implement the CMC Order by deregistering all of IHL's shares in Korek and returning

9

them to Korek's original Iraqi shareholders, including Mr. Barzani.  *Id.* ¶ 45.  As a result, Iraq Telecom's massive investment in Korek was wiped out and handed over to Mr. Barzani and his associates.  *Id.*

It soon became apparent that this CMC Order was part of a corrupt plot orchestrated by the Judgment Debtors, who stole Iraq Telecom's investment in Korek by bribing Iraqi government officials to procure the CMC Order.  *See generally id.* § D (Background).  IBL had participated in this scheme not just in the manner described *supra* II, but also by issuing paperwork to facilitate a bribe for CMC officials.  *See id.* § H ¶¶ 146-203 (describing the bribery scheme and IBL's role within).

Iraq Telecom commenced an ICC Arbitration, ICC Case No. 25194/AYZ/ELU, against the Judgment Debtors on March 16, 2020 (the "**ICC Arbitration**").  ICC Award § C (Procedural History).  The Judgment Debtors appeared and participated in the proceedings.  *See id.* at 1-2.

The ICC tribunal rendered the 296-page ICC Award in favor of Iraq Telecom on March 20, 2023, determining that Mr. Barzani, Korek, and CS Ltd. engaged in bribery, corruption, and fraud.  *See* Ex. 1.  The evidence of fraud and corruption was "both striking and damning."  ICC Award § H ¶¶ 35-36.  This included "evidence of illicit payments and/or the improper conferral of benefits upon members of the CMC."  *Id*. § H ¶ 144.  Through these bribes, the Judgment Debtors "procured the CMC [Order] … to force [Iraq Telecom] out of Korek, to interfere with [Iraq Telecom's] Call Option rights and so cause harm to [Iraq Telecom and IHL]."  *Id.* § H ¶ 35.

In addition, the ICC tribunal found it "clear" that "that there was an agreement between the Respondents fraudulently to misrepresent to [Iraq Telecom] and to [IHL] the nature and terms of the IBL Loan in order to procure the execution of the IBL Loan Agreement and of the Subordination Agreement."  *Id.* § K ¶ 49.  The evidence showed that "[Iraq Telecom] and its

10

representatives were repeatedly told that the IBL Loan was being provided on an unsecured basis." *Id.* § K ¶ 50. "These statements were clearly false," and IBL's prior attempts to obfuscate the truth "serve[] only to compound the egregious nature of its, and the [Judgment Debtors'] behaviour," given that "[t]he picture being deliberately presented to [Iraq Telecom] by IBL and the [Judgment Debtors] was that the Loan was unsecured." *Id.* § K ¶ 54.

The ICC tribunal awarded $1,329,004,217.00 in damages to IHL against Mr. Barzani and CS Ltd.; $300,470,518.00 in damages to Iraq Telecom against Mr. Barzani, Korek, and CS Ltd.; and $19,934,489.30 in costs and fees to Iraq Telecom against Mr. Barzani, Korek, and CS Ltd., totaling approximately $1.65 billion, plus interest. *Id.* § U ¶ 1.

Subsequently, Iraq Telecom moved to recognize and confirm the ICC Award pursuant to the New York Convention in the U.S. District Court for the Eastern District of Pennsylvania, where it had previously brought another Section 1782 proceeding to obtain evidence of the Judgment Debtors' bribe payments. On August 23, 2024, the court granted confirmation of the Award. *See Iraq Telecom Ltd. v. Mustafa*, 2024 WL 3927219, at \*5 (E.D. Pa. Aug. 23, 2024). Two weeks later, the court issued the Judgment recognizing the ICC Award, which, accounting for post-Award interest, totaled approximately $1.81 billion, plus federal post-judgment interest. *See* Judgment, *Iraq Telecom Ltd. v. Mustafa*, No. 24-cv-3728, Dkt. No. 7 (E.D. Pa. Sept. 20, 2024). On February 27, 2025, Iraq Telecom registered the Judgment with this Court. Dkt. No. 1.

The Judgment Debtors have not satisfied any amount of the Judgment.

## V.   **IBL's Custody And Possession Of Judgment Debtors' Money Or Property**

Evidence obtained through the contested LAMC and ICC arbitration proceedings, Section 1782 proceedings, and post-judgment discovery from correspondent banks in New York in related matters reveals that IBL has custody of money or property of the Judgment Debtors. Specifically, the Judgment Debtors have several IBL bank accounts (collectively, and any other

such accounts, "**Judgment Debtors' IBL Accounts**"). *See* Tahler Decl., Ex. 8 (compilation of SWIFT records evidencing the Judgment Debtors' IBL Accounts).

To route such U.S.-dollar deposits, IBL maintains or has maintained correspondent banking relationships with several New York–based U.S. banks as follows: (1) J.P. Morgan Chase Bank NA (2018 to the present); (2) Citibank N.A. (2013 to present); (3) The Bank of New York Mellon (2011 to present); and (4) Wells Fargo Bank N.A. (2011 to 2012) (the active accounts being the "**New York Accounts**").[6] IBL continues to maintain U.S.-dollar reserves in its New York Accounts, in part to comply with the attachment order issued by this Court. *See Iraq Telecom Limited v. IBL Bank S.A.L.*, No. 1:21-cv-10940, Dkt. No. 186 (S.D.N.Y. Jan. 9, 2023). According to IBL's 2018 Annual Report, "[t]he primary currency of the economic environment in which the Group operates (functional currency) is the U.S. Dollar."[7] IBL "provides its clients with a full range of commercial banking services and products, in addition to trade finance services through its network of international correspondent banks" including its New York Accounts. *Id.* at 22. As confirmed by post-judgment discovery obtained in related proceedings from New York correspondent banks, IBL used correspondent accounts in New York to receive U.S.-dollar deposits into the Judgment Debtors' IBL Accounts, including the Barzani Collateral, as explained above.

Iraq Telecom served thirteen branches of IBL in Lebanon with identical information subpoenas and restraining notices ("**Subpoena and Restraining Notice**") pursuant to CPLR 5224

---

[6] *See IBL Bank Annual Reports: 2011 to present*, *supra* note 4; U.S. Commercial Serv., Dep't of Commerce, *Lebanon Country Commercial Guide 2021*, at 32-33 (2021), https://tinyurl.com/33wbnned (last visited October 20, 2025); *see also Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 268 (2d Cir. 2022) (discussing attachment of IBL's funds in the New York Accounts).

[7] *IBL Bank Annual Report 2018*, at 78, https://tinyurl.com/yzx24dh4 (last visited October 20, 2025).

and 5222, respectively, as made available by Federal Rule of Civil Procedure 69(a).  *See* Tahler Decl., Ex. 9 (one such restraining notice and information subpoena).  The information subpoena contained eight questions, asking IBL to, among other things, identify: (1) "any loans of any nature" between IBL and the Judgment Debtors, (2) the Barzani Collateral, including "the status, branch, and/or account location, and any and all rights and obligations" associated with it, (3) "the account(s) from and to which IBL paid [Mr. Barzani] a percentage of the interest paid to IBL by [] Korek ... which totaled over $19 million per year," and (4) "all IBL bank accounts" in which the Judgment Debtors have an interest.  *See id.* at 11-13.  On May 30, 2025, Iraq Telecom served Mr. Barzani with copies of the Subpoena and Restraining Notice.  *See* Dkt. No. 13-2 (proof of mailing); CPLR 5222(d).

Counsel for IBL emailed objections to the Subpoena and Restraining Notice to counsel for Iraq Telecom.  *See* Tahler Decl., Ex. 10.  IBL objected to the Subpoena and Restraining Notice in their entirety and refused to answer any questions.  IBL claimed, among other things, that the Subpoena and Restraining Notice had no "effect in Lebanon" because they sought to enforce a U.S. judgment without obtaining recognition in Lebanon.  *See id.* at 1-2, 4-5.  IBL also claimed that the Subpoena and Restraining Notice "violate[d] international comity."  *See id.* at 3-4, 5-6.  As to the restraining notice specifically, IBL claimed that it was "unenforceable and ineffective" as against any assets, accounts, or other property in the "branches of a foreign bank outside New York" because of the separate entity rule under New York law.  *See id.* at 2-3 (quoting *Motorola Credit Corp. v. Standard Chartered Bank*, 21 N.E.3d 223 (N.Y. 2014)).  As to the information subpoena, IBL claimed that the questions required disclosure of information that was prohibited under Lebanon's Law of September 3, 1956 on Banking Secrecy ("**Lebanon's Banking Secrecy Act**") and Lebanon's Law No. 81 of 2018 relating to Electronic Transactions and Personal Data.

13

*See id.* at 6, 7.  IBL did not contest it was subject to this Court's personal jurisdiction or assert any rights to the Barzani Collateral.

**LEGAL STANDARD**

A motion to enforce a money judgment is governed by Rule 69(a), which provides that "'proceedings supplementary to and in aid of judgment or execution ... must accord with the procedure of the state where the court is located.'"  *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018) (quoting Fed. R. Civ. P. 69(a)).  In New York, Article 52 of the CPLR governs the enforcement and collection of money judgments.  *See Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*, 740 F.3d 108, 110 (2d Cir. 2014).

Under CPLR 5225(b), Iraq Telecom, as judgment creditor, may proceed against IBL as "a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor."  CPLR 5225(b).  "[W]here it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court *shall* require [IBL] to pay the money" to Iraq Telecom.  *Id.* (emphasis added).  Similarly, under CPLR 5227, Iraq Telecom may proceed against "any person who it is shown is or will become indebted to the judgment debtor, [and] the court may require such person to pay to the judgment creditor the debt upon maturity."  These provisions are "essentially interchangeable," since money held by a garnishee like IBL under CPLR 5225 may also be framed as a debt owed to a Judgment Debtor under CPLR 5227.  *LaBarbera v. Audax Const. Corp.*, 971 F. Supp. 2d 273, 278 (E.D.N.Y. 2013); *see* Richard C. Reilly, McKinney's Practice Commentaries, C5227:3, *Proceedings under CPLR 5225(b) and 5227 Distinguished* (2015).  A judgment creditor may seek turnover against any kind of personal property, including intangible property rights.  *See Attestor Master Value Fund LP v. Argentina*, 113 F.4th 220, 233-

14

34 (2d Cir. 2024) (affirming turnover of reversionary interests in collateral securing sovereign bonds), *cert. denied sub nom. Republic of Argentina v. Attestor Master Value Fund LP*, 145 S. Ct. 1141 (2025).

This turnover motion pursuant to CPLR 5225 or 5227 is subject to summary determination standards akin to a motion for summary judgment, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995), and is properly brought "by motion and [] not [] a special proceeding, as long as the court has personal jurisdiction over the garnishee" IBL, *CSX Transp.*, 879 F.3d at 468-69.

"[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee." *Peterson v. Bank Markazi*, 121 F.4th 983, 998 (2d Cir. 2024) (quoting *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 831 (2009)), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025); *see also Attestor*, 113. F.4th at 233-34 (ordering turnover of Argentina's reversionary interest in bond collateral part of which was located outside New York).

## ARGUMENT

The Court should order IBL to turn over all money and intangible property rights in which the Judgment Debtors have an interest.  IBL deliberately exploited New York's correspondent banking system to transfer the $155-million Barzani Collateral and execute its fraudulent scheme, thereby subjecting itself to this Court's personal jurisdiction under CPLR 302.  Having purposefully availed itself of New York's financial infrastructure, IBL cannot now claim immunity from New York's enforcement remedies simply because the relevant accounts may be located abroad.  Under clearly established Second Circuit and New York precedent, a court with personal jurisdiction over a foreign bank may order turnover of assets held outside New York as well.

15

The Judgment Debtors' funds and property rights satisfy all requirements for turnover under CPLR 5225(b), or alternatively, warrant entry of a money judgment against IBL under CPLR 5227.

## I. THIS COURT SHOULD ORDER IBL TO TURN OVER JUDGMENT DEBTORS' COLLATERAL AND INTANGIBLE PROPERTY RIGHTS UNDER CPLR 5225(B).

Iraq Telecom satisfies both the jurisdictional and substantive requirements for a turnover order under CPLR 5225(b). IBL's repeated and deliberate use of New York correspondent accounts—particularly its routing of the Barzani Collateral through The Bank of New York Mellon—establishes clear grounds for personal jurisdiction under both CPLR 302(a)(1) and (a)(2), and comports with due process requirements.

Once jurisdiction is established, the substantive turnover analysis is straightforward: IBL possesses money and reversionary interests belonging to the Judgment Debtors, and as the rightful owners of these assets, the Judgment Debtors are entitled to their possession. The geographic location of these assets presents no barrier to turnover when, as here, the garnishee bank has systematically utilized New York's banking system to facilitate the very transactions at issue.

### A. This Court Has Personal Jurisdiction Over IBL.

"When assessing whether specific personal jurisdiction 'exists over a non-domiciliary, [this Court will] first consider whether the state's longarm statute provides a statutory basis for jurisdiction and, if so, whether exercising personal jurisdiction would comport with due process.'" *Peterson*, 121 F.4th at 1002 (quoting *Edwardo v. Roman Cath. Bishop of Providence*, 66 F.4th 69, 73 (2d Cir. 2023) (per curiam)). IBL did not dispute that it was subject to this Court's personal jurisdiction when it was served with the restraining notice, and cannot argue that it is not subject to this Court's personal jurisdiction for purposes of this turnover motion.

### 1.    New York's Long-Arm Statute Provides For Personal Jurisdiction Over IBL.

This Court has personal jurisdiction over IBL under two provisions of New York's long-arm statute, CPLR 302(a)(1) and (2).  These provisions permit a Court to exercise jurisdiction over a nondomiciliary "[a]s to a cause of action arising from … any non-domiciliary … who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state …."  CPLR 302(a)(1)-(2).

Jurisdiction exists under CPLR 302(a)(1) if IBL "transacts any business in New York" through, among other things, its New York correspondent banking accounts, and the Judgment Creditors' "cause of action [for turnover] arises from such a business transaction." *Peterson*, 121 F.4th at 1002 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012)) (cleaned up).  As to the first prong, under longstanding precedent, a foreign bank's maintenance and use of its New York correspondent banking accounts constitutes transacting business in the state.  *Id.*; *see, e.g.*, *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 11 (N.Y. 2016) ("Defendants' correspondent banking activity is sufficient to establish a purposeful course of dealing, constituting the transaction of business in New York under CPLR 302(a)(1)."); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129-31 (2d Cir. 2022) (describing the uses of a correspondent bank account that support jurisdiction under New York's long-arm statute).  IBL has long maintained and used correspondent accounts in New York, and, indeed, used them to move the Barzani Collateral to the Judgment Debtors' accounts when effectuating the IBL Loan Scheme. *See* Ex. 7 (Barzani Collateral SWIFT record).

As to the second prong, Judgment Creditors' claim likewise "arises from" IBL's New York business transactions.  When a judgment creditor seeks turnover, the "claim" for purposes of CPLR

17

5225(b) is the request for turnover. *See Peterson*, 121 F.4th at 1004. The Second Circuit has squarely held that a claim for turnover arises out of a foreign bank's use of a New York correspondent account if the foreign bank used that correspondent account to fund the account that is subject to turnover. *See id.* at 1004-05. Thus, in *Peterson*, the Second Circuit held that a claim for turnover of funds held by Clearstream Banking in Luxembourg arose out of Clearstream's use of a New York correspondent account because the judgment debtor's account "in Luxembourg [] reflects the proceeds of transactions that Clearstream undertook using the New York [correspondent account]." *Id.* at 1005. The funds in the Luxembourg account thus "could not exist without Clearstream's corresponding transactions in New York." *Id.*

The same analysis controls here. IBL acquired the $155-million Barzani Collateral presently held in the Judgment Debtors' IBL Accounts by secretly routing it through IBL's New York Account at The Bank of New York Mellon, to Mr. Barzani's IBL account in Beirut, Lebanon. *See* Ex. 7; *see also* LAMC Award ¶¶ 429, 620, 911; ICC Award § K ¶¶ 49-65. IBL received other money in the Judgment Debtors' IBL Accounts through its New York Accounts as well. *See* Ex. 8 (SWIFT records). Thus, "[n]either element of N.Y. C.P.L.R. 5225(b) can thus be extricated from the 'frequen[t] and deliberate nature of [IBL's] use of its correspondent account,'" and both prongs of CPLR 302(a)(1) are satisfied. *Peterson*, 121 F.4th at 1005 (citation omitted, second alteration in original).

Finally, this Court also has jurisdiction over IBL pursuant to CPLR 302(a)(2) because IBL committed tortious acts within the state by using a New York Account at The Bank of New York Mellon to transfer the Barzani Collateral and effectuate the IBL Loan fraud. *See* Ex. 7. For purposes of CPLR 302(a)(2), "a financial fraud tort can be deemed to have occurred within [New York], when neither a defendant nor its agents had physical contacts within the boundaries of New

18

York, where an out-of-state defendant uses a modern-day financial system and a New York based bank account to commit a financial fraud tort within the boundaries of New York." *Bangladesh Bank v. Rizal Com. Banking Corp.*, 208 N.Y.S.3d 2, 19-20 (N.Y. App. Div. 1st Dep't 2024) (citation omitted, cleaned up).  Here, IBL perpetrated its defrauding of Iraq Telecom by routing the Barzani Collateral through IBL's New York Accounts.  *See supra* I.V; *Iraq Telecom Ltd.*, 597 F. Supp. 3d at 669; Dkt. No. 1.  The LAMC Award and judgment confirming it have both established that this amounted to fraudulent conduct by IBL, thus satisfying CPLR 302(a)(2).

### 2.    Exercising Personal Jurisdiction Over IBL Is Consistent With Due Process.

The exercise of personal jurisdiction over IBL also "comport[s] with the Due Process Clause" because "minimum contacts and reasonableness" are both satisfied.  *Peterson*, 121 F.4th at 1005 (citation omitted).  The Due Process Clause permits a court to exercise jurisdiction over a foreign financial institution that uses a correspondent account to transfer funds to an account overseas.  *See id.* at 1005-06 ("[P]ersonal jurisdiction over [the defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute." (second alteration in original)); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (noting that a case would be "rare" in which contacts satisfy CPLR 302(a)(1) yet fail to comport with due process).  A bank's "deliberate and recurring use" of a New York correspondent bank is the "paradigmatic example of 'purposeful availment.'"  *Lelchook v. Societe Generale de Banque au Liban S.A.L.*, 147 F.4th 226, 240-41 (2d Cir. 2025) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 364 (2021)).  Thus, "the exercise of personal jurisdiction is reasonable under the Due Process Clause" because "[IBL] has purposefully availed itself of the laws of New York, [and] it would be unfair to allow it to evade jurisdiction in the state."  *Peterson*, 121 F.4th at 1006-07 (citations omitted).

19

**B.**      **All Requirements For Turnover Under CPLR 5225(b) Are Satisfied.**

CPLR 5225(b) "provides for a two-step analysis in determining whether property belonging to a judgment debtor—but in the possession of a third party [IBL]—should be turned over to a judgment creditor." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 447 (S.D.N.Y. 2024) (quoting *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991)), *aff'd,* 2025 WL 289499 (2d Cir. Jan. 24, 2025). "First, it must be shown that the judgment debtor 'has an interest' in the property," and second, "the judgment debtor" either must be "'entitled to the possession of such property'" or its "rights to the property [must be] superior to those of the party in whose possession it is." *Id.* (citation omitted, cleaned up). Both prongs of CPLR 5225(b) are satisfied here.

"The first prong of [CPLR] 5225(b) is satisfied because the property that [Iraq Telecom] is trying to reach" are all money in the possession or custody of IBL in which the Judgment Debtors have an interest and their intangible property rights. *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019). Evidence obtained in the LAMC and ICC Arbitrations, the Section 1782 proceedings, and post-judgment discovery from correspondent banks in New York in related matters has confirmed that IBL is in possession or custody of money or property of the Judgment Debtors in at least twelve of Judgment Debtors' IBL Accounts, including Mr. Barzani's account containing the Barzani Collateral. *See* Ex. 8 (SWIFT records); Ex. 7 (Barzani Collateral SWIFT transfer record).

The "second prong [of CPLR 5225(b)] is satisfied because as the owner[s]" of such money and the property rights associated with them, the Judgment Debtors are "entitled to the possession of the funds" and the exercise of those property rights. *Commodities & Mins. Enter. Ltd.*, 423 F. Supp. 3d at 51 (internal quotation marks omitted); *see also Reich v. Casabella Landscaping, Inc.*, 2024 WL 4950033, at *4 (S.D.N.Y. Dec. 3, 2024) (same). "Under New York law … [w]hen a

20

party holds funds in a bank account, possession is established, and the presumption of ownership follows." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002). Similarly, under Lebanese law, depositors have both an interest in the funds deposited into their bank accounts and an entitlement to possession of the amount of deposited funds as creditors of the bank. *See* Decl. of Professor Nasri Antoine Diab ¶¶ 14-22, *Iraq Telecom Limited v. IBL Bank S.A.L.*, No. 21-cv-10940, Dkt. No. 102 (S.D.N.Y. Feb. 14, 2022) (declaration by Lebanese law expert in a previous action against IBL explaining Lebanese-bank-account owners' rights of withdrawal); *cf. Gryphon Domestic VI, LLC v. APP International Finance Co.*, 836 N.Y.S.2d 4, 12-13 (N.Y. App. Div. 1st Dep't 2007) ("[T]he turnover order properly should [] include[] bank accounts" located in Indonesia).

### C.    This Court Can Order Turnover Of Overseas Property Because It Has Personal Jurisdiction Over IBL.

The fact that the Barzani Collateral is held to the credit of Lebanese accounts does not pose any obstacle to turnover under New York law. In its objections to Iraq Telecom's restraining notice, IBL incorrectly contended that the Judgment Creditors must first obtain recognition of the Judgment in Lebanon before seeking turnover of assets held there. *See* Ex. 10, at 2-3. In fact, "a court sitting in New York that has personal jurisdiction over a garnishee bank can order the bank to produce [the Judgment Debtors' property] located outside New York, pursuant to CPLR 5225(b)." *Koehler*, 911 N.E.2d at 830-31 (not requiring domestication in garnishee bank's home of Bermuda); *see, e.g.*, *Pala Assets Holdings, Ltd. v. Rolta, LLC*, 167 N.Y.S.3d 788, 789 (N.Y. App. Div. 1st Dep't 2022) (affirming turnover of Indian assets without requiring recognition of judgment in India); *cf. AT&T Mobility Holdings B.V. v. Grupo Salinas Telecom, S.A. de C.V.*, 234 N.Y.S.3d 101, 102 (N.Y. App. Div. 1st Dep't 2025) (affirming judgment debtors' contempt for refusing to comply with turnover of Mexican assets). Accordingly, this Court can order IBL to

turn over property held to the credit of Lebanese accounts based on its personal jurisdiction over IBL.

IBL also asserted, incorrectly, that the separate entity rule rendered the restraining notice ineffective. The separate entity rule is a common law rule that holds that "a judgment creditor's service of a restraining notice on a garnishee bank's *New York branch* is ineffective … to freeze assets held in the bank's ***foreign branches***." *Motorola Credit Corp. v. Standard Chartered Bank*, 771 F.3d 160, 161 (2d Cir. 2014) (emphasis added, citation omitted). The separate entity rule is thus "akin to a rule governing service of process," not a prohibition on using CPLR Article 52 remedies against a foreign bank. *Glob. Tech., Inc. v. Royal Bank of Canada*, 34 Misc. 3d 1209(A), 2012 WL 89823, at *13 (N.Y. Cnty. Sup. Ct. 2012); *see Next Invs., LLC v. Bank of China*, 12 F.4th 119, 133 (2d Cir. 2021) (endorsing this view and citing *Glob. Tech.*); *John Wiley & Sons, Inc. v. Kirtsaeng*, 2009 WL 3003242, at *3 (S.D.N.Y. Sept. 15, 2009) (explaining that the separate entity rule "limits the effect of Plaintiff's service in New York"). Here, by contrast, IBL has no New York branch, and Iraq Telecom does not seek to serve only its New York branch, so the separate entity rule is orthogonal to this motion. *Cf. Peterson*, 121 F.4th at 1004-06 (not discussing separate entity rule with respect to turnover from foreign bank where jurisdiction over foreign branch was proper); *Koehler,* 911 N.E.2d at 829-31 (similar). In the interest of mooting this issue, however, Iraq Telecom has arranged for service of this turnover motion on every one of IBL's branches that may hold a Judgment Debtor account.

## II.    IN THE ALTERNATIVE, THIS COURT SHOULD ENTER A MONEY JUDGMENT AGAINST IBL BANK.

To the extent this Court does not order turnover of all money and reversionary interests in the possession or custody of IBL in which the Judgment Debtors have an interest, the Judgment Creditors respectfully request that this Court "direct that a judgment be entered against [IBL] in

22

favor of the judgment creditor[s]" equal to the debt IBL owes to the Judgment Debtors with respect to those Accounts and the Barzani Collateral under CPLR 5227.

"[T]here is no substantial difference between the procedures provided by CPLR 5225(b) and CPLR 5227." *JPMorgan Chase Bank, N.A. v. Motorola, Inc.*, 846 N.Y.S.2d 171, 179 (N.Y. App. Div. 1st Dep't 2007) (if a court grants turnover under the wrong provision, the "error" is only "one of form"). New York has abolished the "distinction in [CPLR] 5201 between 'debt' and 'property,'" and courts "should instead focus on whether the asset has economic potential." *All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 23 (2d Cir. 1999). Thus, "[i]f from the judgment creditor's point of view the asset is worth pursuing as a matter of economics, [New York] authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the chase." *Id.* (quoting David D. Siegel, *Practice Commentaries* § C5201:5 (McKinney 1997)); *see also, e.g.*, *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202, 1209 (N.Y. 2010) (describing "the distinction between 'debt' and 'property'" as "unnecessary"); David D. Siegel, *Practice Commentaries* § 510 (6th ed. Dec. 2024 update) (petition for turnover based "on both provisions together" is "an acceptable step because procedurally they are just about the same"); *LaBarbera*, 971 F. Supp. 2d at 278.

Accordingly, to the extent this Court declines to issue a turnover order against all money and reversionary interests in the possession or custody of IBL in which the Judgment Debtors have an interest under CPLR 5225(b) (or IBL refuses to turn it over in its entirety), this Court should enter a judgment against IBL equal to the USD sums within those accounts, including the $155-million Barzani Collateral, under CPLR 5227. *See, e.g.*, *Bass v. Bass*, 528 N.Y.S.2d 558, 560 (N.Y. App. Div. 1st Dep't 1988) (reversing trial court's declining to enter judgment against third party that owed debt to judgment debtor under CPLR 5227).

23

## **CONCLUSION**

This Court should order IBL to turn over all money and intangible property rights in which the Judgment Debtors have an interest—including bank accounts and reversionary interests—or, in the alternative, enter judgment against IBL.

DATED:  October 20, 2025          Respectfully submitted,

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By:     *s/ Kristin N.Tahler*
          Kristin N. Tahler
          865 S. Figueroa St., 10th Floor
          Los Angeles, CA 90017
          Tel: 213-443-3000
          kristintahler@quinnemanuel.com

          Dennis Hranitzky
          295 Fifth Avenue
          New York, NY 10016
          Tel: 212-849-7000
          dennishranitzky@quinnemanuel.com

          Alex H. Loomis (*pro hac vice* pending)
          111 Huntington Ave, Suite 520
          Boston, MA 02199
          Tel: 617-712-7100
          alexloomis@quinnemanuel.com

          Gregg Badichek
          1300 I Street NW Suite 900
          Washington, D.C. 20005
          Telephone: (202) 538-8000
          greggbadichek@quinnemanuel.com

          *Counsel for Plaintiff Iraq Telecom Limited*

## CERTIFICATION OF COMPLIANCE

This memorandum complies with the page-count limit of Rule 4(c)(ii) of Judge Ho's Individual Rules and Practices in Civil Cases because it contains 24 pages, excluding the parts of the memorandum exempted by Rule 4(c)(iv).

DATED:  October 20, 2025          Respectfully submitted,


By:     *s/ Kristin N. Tahler*
        Kristin N. Tahler

        *Counsel for Plaintiff Iraq Telecom Limited*

25